IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RYAN PRESLEY,                                )
                                             )
                    Plaintiff,               )        Civil Case No. 07-276-KI
                                             )
        vs.                                  )        OPINION AND ORDER
                                             )
FREIGHTLINER, LLC,                           )
                                             )
                    Defendant.               )
_____         )

       David H. Griggs
       Megan Dolan
       Dolan Griggs LLP
       1130 S. W. Morrison Street, Suite 630
       Portland, Oregon  97205

              Attorneys for Plaintiff

       Victor J. Kisch
       Marc E. Alifanz
       Stoel Rives LLP
       900 S. W. Fifth Avenue, Suite 2600
       Portland, Oregon  97204-1268

              Attorneys for Defendant

KING, Judge:

After plaintiff Ryan Presley had a run-in with a co-worker and management concluded that he did not cooperate with the supervisor who intervened, defendant Freightliner, LLC terminated his employment. Presley filed a grievance and was reinstated under a last chance agreement. Eight months later, a message printed on Presley's T-shirt caused another altercation with supervisors resulting in Freightliner terminating Presley again for insubordination. Presley alleges he was actually fired because of race discrimination. Before the court is Defendant's Motion for Summary Judgment (#29). For the following reasons, I grant summary judgment and dismiss all claims.

## FACTS

Ryan Presley began working as a chassis suspension installer under Don Burdge in Pool 21 at Freightliner's Portland Truck Manufacturing Plant ("Plant") on February 18, 2005. Presley, an African American, is a member of Machinist's Union Local 1005.

Presley complains that Burdge racially harassed him by telling Presley that he would not last long in Burdge's neighborhood, by talking about "jigs," and by calling African American employees "boy." Presley believes he was also watched more closely than the Caucasian employees and reprimanded for things Caucasian employees were allowed to do without reprimand, such as using the bathroom.

In response to Presley's complaint, Freightliner moved him to Pool 3 under a new supervisor, Bart Spencer.

In early July 2005, Wayne La Rochelle became Human Resource Manager for the Plant. On July 14, 2005, La Rochelle learned of an incident the night before during which Presley

argued with a Team Leader, Warren Friswold.  La Rochelle investigated by reviewing summaries from the supervisors witnessing the incident and interviewing some people, including Presley's co-workers.  La Rochelle concluded:  (1) Friswold stopped when told to by a supervisor; and (2) Presley continued to be disruptive and argumentative when asked to stop, continued to argue with two supervisors, and did not follow directions.  La Rochelle also concluded that Presley threatened to "kick their F'ing ass," including the supervisor.  La Rochelle Dep. at 36.

Presley states that Friswold forcefully grabbed his arm during the confrontation and that both men were yelling at each other.  Presley admits that he told Friswold, "If you touch me again, I'm going to whoop your ass."  Presley Dep. at 47.  He also admits that he "flipped Bruce [Smith, Friswold's supervisor] off" and told him "fuck you . . . you not doing nothing about the situation."  Id. at 49 (exact language quoted).  After Presley walked away, Friswold "was still ranting and raving, you know, to Bruce and to whoever else was over."  Id. at 61.  According to Presley, Spencer came to talk to him about the incident, started bumping his chest against Presley's shoulder, and asked if Presley wanted to hit him.  When Presley said "no," Spencer sent Presley home.

Several other employees gave written statements that they saw Friswold touch or grab Presley's arm during the argument and that Spencer pushed right up against Presley.  Riller Clegg gave a statement to La Rochelle and was interviewed by him.  According to Clegg, who witnessed the incident from about ten or twenty feet, Friswold provoked Presley earlier in the day by throwing Presley's tools to the floor.  Later in the day, tensions rose between the workers in Pools 2 and 3 and Friswold pushed Presley, starting the argument.  Friswold was told to leave by Smith but he walked off a couple of feet and turned to continue to argue with Presley.  Friswold

was in Spencer's face talking loud, just like Presley. Eric Edwards states that Friswold grabbed Presley by the arm and pushed him. Edwards did not state that Friswold argued with a supervisor.

La Rochelle terminated Presley on July 18, 2005 and stated in a letter to Presley: "During this incident your [sic] were insubordinate to management staff, you were verbally abusive, and you threatened to cause bodily harm to one of the shop floor employees, as well as a member of our Production Supervisory staff." La Rochelle Decl Ex. 1.

On September 29, 2005, Presley filed a charge with the Bureau of Labor and Industries ("BOLI") alleging discrimination and retaliation based on race. The Union grieved Presley's termination and a hearing was held by Freightliner's Board of Adjustment ("Board"), consisting of two Union and two management employees. After a hearing, the Board concluded that Presley was verbally insubordinate but reinstated him without back pay on a six-month last chance agreement.

The last chance agreement, titled the "Reinstatement Agreement," gives Presley an unpaid suspension from July 13 through October 7, 2005, assigns Presley to an area he had not worked in previously, if Presley so desires, and states: "Last Chance Agreement lasting 6 months – Ryan can not [sic] make any bodily harm threats to anyone that takes offense, determined by the grievance process." Presley Decl. Ex. 5.

Presley returned to work in mid-October and chose to work in the Offline area of the Plant under supervisors Keenan Kahl and Robert Looney.

On November 30, 2005, Presley was seen riding an electric "ding cart" before his shift. According to Looney, ding carts are reserved for material handlers and are not for general use.

Page 4 - OPINION AND ORDER

He approached Presley and explained that he could not ride the cart without permission but did

not discipline him.  Presley argued with Looney in an angry, profane, and insubordinate manner,

turned his back, and walked away.  Looney sent Presley home and reported the incident to

La Rochelle.

According to Presley, the ding cart is often used by everyone for personal reasons, such as

to go to lunch in another part of the Plant or to go to the Nurse's Office, and for work reasons

other than to move materials.  On the day of the incident, he used the ding cart to go to the

Nurse's Office.  Presley agrees that Looney asked him not to use the cart but he claims that he

did not argue with Looney at all.  Presley says that he told Looney that Caucasian employees use

the ding carts all the time and that it was not right that he, "a big black man," was in trouble for

it.  Presley Decl. ¶ 12.  Presley believes that he acted appropriately during the conversation and

did not raise his voice or curse.

On December 2, 2005, La Rochelle met with Presley and the Union and told them that

Presley would be required to attend anger management counseling.  The letter of the same date to

Presley also stated:  "Freightliner will no longer tolerate your argumentative, disruptive, and

offensive insubordinate behavior."  Alifanz Decl. Ex. 1 at 27.  Presley attended three anger

management sessions.

On December 13, 2005, Presley reported to management that he was called a "pit

monkey" by a co-worker while working in the "pit" underneath a truck chassis.  Presley thought

the term was racially insensitive.  La Rochelle states that the term is commonly used in this

nonracial way.  Freightliner investigated by interviewing people.  During Presley's interview,

Rick Oliver and Robert Looney were joking disrespectfully that they were not aware that the term

"monkey" was ever used as a racial slur towards an African American.  When Presley claimed he

would have been fired if he had called one of them a cracker or a honkey, they claimed they were

also unaware of those racial slurs.  Presley accepted the co-worker's apology the next day.

La Rochelle claims that he sent a copy of the harassment policy to all personnel the next day but

Presley never received it.

   In January 2006, Presley was moved back to Pool 3 under supervisor Robert Elsen.

   On March 9, 2006, Presley wore a T-shirt to work that read "More Black Team leaders

More Black Supervisors at this company."  Presley Decl. Ex. 7.  La Rochelle states that his staff

received a call reporting that a number of employees were uncomfortable with the shirt.

La Rochelle asked Fred MacKenzie, Chief Shop Steward, and Bruce Lathan, an African

American Shop Steward, to tell Presley he was making other workers uncomfortable and that he

needed to take the shirt off, cover it up, or go home.  MacKenzie and Lathan met with Presley,

who at first refused to cover the shirt but then agreed to do so.  Freightliner claims that Presley

became angry and raised his voice but Presley denies this.

   Presley went to La Rochelle's office to ask if he could keep the shirt uncovered.  Presley

claims that La Rochelle told him, "You guys wouldn't like it, you know, if, you know, a white

man was to come in here and wear the same shirt."  Presley Dep. at 169.  According to

La Rochelle, he told Presley that workers complained about the shirt and that it was inappropriate

in the workplace.  Presley denies that La Rochelle told him this but does admit that he called

La Rochelle a racist and left the office.  Outside the office, Presley admits he told La Rochelle in

front of several other employees that he was a "fucking racist."  Presley kept repeating the phrase

to drown out what La Rochelle was saying.  Some other words were exchanged and Presley

Page 6 - OPINION AND ORDER

started walking back to the Plant.  Along the way, Presley encountered Plant Manager Brian Mooers talking to Lathan.  Presley showed Mooers his shirt and asked if he found it offensive. Mooers said that he did and refused to talk about the shirt further.  Presley accused Mooers of being a racist.  Ten minutes later, another manager sent Presley home.

In consultation with the Union, La Rochelle decided to terminate Presley for violating his anger management letter.  When Presley arrived the next day, he met with La Rochelle, Paul Erdy, Director of Manufacturing, and Frank Rouse, a Shop Steward.  La Rochelle told Presley that his employment was terminated because he had been insubordinate, disruptive, and had violated the terms of his anger management letter.  According to La Rochelle, Presley argued and called everyone at the meeting "a bunch of fucking racists."  La Rochelle ended the meeting. Presley denies that he called anyone a racist, raised his voice, or used profanity during the termination meeting.

Presley grieved his termination but after investigating, the Union decided that the grievance was without merit.  Presley filed a second BOLI charge on March 20, 2006 alleging race discrimination, harassment, and retaliation, as well as some other charges that are not relevant to this case.

Lathan states that he has seen others, including himself, get angry at work and use profanity.  He is aware of four or five people who were fired for insubordination after repeatedly arguing with their team leaders or supervisors.

According to Presley, the use of profanity and arguments between employees and supervisors was common in the workplace.  He also complains of closer supervision by Looney

for things such as standing by the chain and waiting for a truck.  Presley claims that everyone

does this but he was the only one reprimanded.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

Presley alleges claims under Title VII and ORS Ch. 659A for disparate treatment race

discrimination, hostile environment race discrimination, and retaliation, and under

ORS 659A.230 for discrimination for initiating a civil proceeding.

I.      Hostile Environment

Presley voluntarily dismisses his claims under Title VII and ORS Ch. 659A for hostile

environment based on race harassment.

II.     Disparate Impact

Freightliner moves for summary judgment against the disparate impact claims,

contending that Presley was fired for insubordination.

Freightliner argues that Presley cannot establish his prima facie case of discrimination because there is no evidence that it treated similarly situated workers of other races more favorably than it treated Presley. In particular, Freightliner argues that Friswold is not a comparator because he made no threats to supervisors. Freightliner also argues that comparators' conduct must be evaluated from the employer's perspective. Finally, Freightliner notes that Presley does not identify any Caucasian employees who were not fired when they engaged in insubordinate conduct after receiving a last chance agreement.

Presley contends that factual issues regarding the alleged misconduct make it impossible to determine if similarly situated employees were treated differently. He disputes that he was angry, violent, or insubordinate in any of the incidents. Concerning Friswold as a comparator, Presley argues that he made no threats to anyone and Friswold provoked him by forcefully grabbing Presley's arm.

To prove a Title VII disparate treatment claim, a plaintiff must establish a prima facie case of discrimination. A prima facie case may be demonstrated by direct evidence of discriminatory intent or may be based on a presumption arising from factors set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Noyes v. Kelly Services, 488 F.3d 1163, 1168 (9th Cir. 2007). Generally stated, the factors are: (1) membership in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) different treatment than those similarly situated outside of the protected class. McDonnell Douglas, 411 U.S. at 802. Direct evidence of discriminatory intent is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003)

Page 9 - OPINION AND ORDER

(discriminatory remark by a non-decisionmaker is not direct evidence because there is no evidence of a nexus between the remarks and the subsequent employment decision) (internal quotation omitted).  At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." Lyons v. England, 307 F.3d 1092, 1112 (9th Cir. 2002) (internal quotation omitted).

The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law.  Henderson v. Jantzen, Inc., 79 Or. App. 654, 657, 719 P.2d 1322.  The Ninth Circuit has held, however, that when analyzing Oregon's disability discrimination statute, it would apply the *McDonnell Douglas* burden-shifting analysis rather than Oregon's rule because the burden-shifting analysis is federal procedural law.  Snead v. Metropolitan Property Casualty Insurance Co., 237 F.3d 1080, 1090-93 (9th Cir.), cert. denied, 534 U.S. 888 (2001).

The only issue is whether Presley can establish the fourth prong of the prima facie case–whether he was treated differently than similarly situated employees outside of his protected class.  The evidence concerning Friswold is that he touched Presley but Presley only threatened Friswold.  Clegg states that Friswold was talking loud in Spencer's face and Spencer is a supervisor.  There is no evidence that Friswold was disciplined in any way for touching Presley.

Turning to other incidents of insubordination, it is apparent that the Plant is a rough-and-tumble place filled with tension, arguments, and profanity.  There is evidence that many others were disciplined for insubordination and a few others terminated for it.

Presley relies on limited statistical information concerning the 17 employees Freightliner formally disciplined for insubordination between 2005 and 2007.  Freightliner argues that the

evidence proffered by Presley does not allow conclusions to be drawn because there is no evidence on whether the insubordination of the various people is similar to that of Presley. Freightliner notes the lack of evidence about the severity, frequency, and type of conduct, or whether any of the employees had a common supervisor.

The evidence consists of 26 pages of disciplinary letters for warnings, suspensions, and terminations; last chance agreements; and BOLI complaints. Seventeen employees other than Presley were disciplined. Three of the employees identify themselves as African American. Of these, two were fired. Two other employees were fired. Based on their names, one is likely Asian and another has an unusual name of unknown race and ethnicity. The descriptions of the misconduct are generally a sentence or two and are not detailed enough to determine the severity of the insubordination. In particular, it is impossible to construct an employee's full disciplinary history, the extent of the final misconduct that resulted in the termination, and the extent of any warnings prior to the termination.

Statistical studies can be used to support a discrimination plaintiff's prima facie case or as evidence of pretext, although it is more typical in a pattern and practice case. See Obrey v. Johnson, 400 F.3d 691, 696 (9th Cir. 2005).

I hesitate to call Presley's numbers a statistical study, however, because the statistical significance has not been calculated. A deviation from a predicted outcome is not probative unless the deviation is statistically significant. Ottaviani v. State University of New York at New Paltz, 875 F.2d 365, 370-73 (2nd Cir. 1989) (in a sex discrimination case, discussion of the standard deviation analysis in a salary study), cert. denied, 493 U.S. 1021 (1990). I agree with Freightliner that little if anything is shown by the numbers in their current state.

Page 11 - OPINION AND ORDER

There is some evidence that Friswold argued with a supervisor and thus could be a comparator to Presley. I am mindful that the prima facie hurdle is a minimal one. I conclude that Presley has established his prima facie case sufficiently to avoid summary judgment. Therefore, I will continue with the analysis.

> If established, the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff. Id. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Id. If the employer meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff then must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1037 (9th Cir. 2005).

"[A] plaintiff can prove pretext in two ways: (1) *indirectly*, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) *directly*, by showing that unlawful discrimination more likely motivated the employer." Noyes, 488 F.3d at 1170 (internal citation and quotation omitted). "[I]n the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006) (noting tension with the Godwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998), line of cases and their standard requiring specific and substantial circumstantial evidence of pretext).

Freightliner states that it terminated Presley in July 2005, after the Friswold incident, for being insubordinate, verbally abusive, and threatening to cause bodily harm to a co-worker and a

supervisor.  It terminated Presley in March 2006, after the T-shirt incident, for being insubordinate, disruptive, and violating the terms of his anger management letter.

Freightliner contends that there is no evidence its legitimate reasons for terminating Presley are a pretext for race discrimination.  Presley argues that summary judgment is inappropriate for several reasons.

One, Presley again disputes the facts underlying all of the events of alleged misconduct. Freightliner notes that the claims of disputed facts are irrelevant because they do not call into question that Freightliner honestly believed its reasons for the actions taken against Presley.

"In judging whether . . . proffered justifications were false, it is not important whether they were *objectively* false (e.g. whether [plaintiff] *actually* lied).  Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless."  <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis in the original).

After the Friswold incident, La Rochelle interviewed witnesses, both supervisors and co-workers of Presley, and took their statements.  During the T-shirt incident, La Rochelle was the person who Presley accused numerous times in a voice loud enough to drown out La Rochelle that he was a "fucking racist."  Even if La Rochelle did not reconstruct the Friswold incident correctly, there is no evidence that he does not honestly believe that Presley was insubordinate during both incidents.  Title VII does not protect employees from bad employment decisions, it protects them from discriminatory ones.  This argument does not support Presley's pretext burden.

Page 13 - OPINION AND ORDER

Two, Presley claims that he made several reports of race discrimination which were either ignored or inadequately investigated. Freightliner argues that this allegation is conclusory and unsupported. Presley's complaint about the pit monkey incident resulted in an investigation and apology from the offending employee. His complaints about Don Burge resulted in an investigation by Freightliner's Human Rights Committee, which interviewed 16 people and wrote a report finding that there was inconclusive evidence of racial harassment but that the environment was to a degree hostile to Presley. To remedy the situation, Freightliner moved Presley to another part of the Plant under a different supervisor. Presley's grievance after the Friswold incident resulted in him being reinstated.

Presley did complain to Looney that white employees could use the ding cart and he, as a "big black man," could not. Looney sent Presley home for arguing with him. Presley does not dispute that he was not disciplined merely for using the cart. Presley does dispute that he became argumentative. There is no evidence, however, that Looney mischaracterized Presley's reaction so that he could send Presley home for discriminatory reasons.

Presley complained to Paul Erdy that Rick Oliver was harassing him when he told Presley not to talk to co-workers at a shift change. Erdy laughed and claimed that Oliver was not harassing Presley. There is no evidence, however, that Presley claimed the cause of the harassment was race discrimination.

In sum, the evidence shows that Freightliner seriously investigated Presley's complaints and often offered concrete remedies to Presley. Any evidence to the contrary is slim and insufficient to create a factual issue that Freightliner had a discriminatory motive.

Page 14 - OPINION AND ORDER

Three, turning to the events of his last day working for Freightliner, Presley contends that the fact that he was asked to cover his shirt, and the fact that he was fired for verbal insubordination when he accused La Rochelle and Mooers of being racists, are evidence of discriminatory motive. As I said above, it is clear that the Plant is a very tense place. There is evidence that people complained to La Rochelle that they were uncomfortable with such a strident statement prominently displayed. Freightliner does not violate the law if it enforces a standard of dress within the Plant. There is no evidence that any clothing bearing anti-minority, white supremacist sentiments was allowed to be worn. Presley does not dispute that he accused La Rochelle and Mooers of being racists, with the charge levied at La Rochelle in a profane and long-winded tirade. Their reaction to Presley's accusations, termination for insubordination, is the typical outcome of an employee losing his temper like this. The T-shirt incident is not evidence of a discriminatory motive.

Four, Presley contends that his conduct did not violate the last chance agreement. Freightliner claims that Presley is quoting only a portion of the agreement and that his conduct expressly violated the terms of the agreement, when considered along with the anger management letter.

The language on which Presley relies came from the October 2005 last chance agreement: "Ryan can not [sic] make any bodily harm threats to anyone that takes offense, determined by the grievance process." Presley Decl. Ex. 5. The December 2005 anger management letter stated: "Freightliner will no longer tolerate your argumentative, disruptive, and offensive insubordinate behavior." Alifanz Decl. Ex. 1 at 27. Freightliner tightened up the last chance agreement when it decided not to terminate Presley in December 2005 after the ding cart incident. Freightliner

Page 15 - OPINION AND ORDER

does not violate Title VII by doing this.  There is no evidence that La Rochelle did not honestly believe that Presley violated the anger management letter's condition for continued employment.

In sum, there is no evidence sufficient to create a factual issue that Freightliner's reasons for either of Presley's terminations were a pretext for race discrimination.

As a final argument, Presley contends that there is a factual issue regarding whether his disparate treatment race discrimination claims exist under a mixed-motive analysis.  Freightliner argues that the analysis of mixed-motive claims does not differ on summary judgment from the analysis of single-motive claims.

In a mixed motive case, a plaintiff may establish a violation of Title VII through a preponderance of the evidence, either direct or circumstantial, that a protected characteristic played a motivating factor.  Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1068 (9th Cir. 2003).  Although this defense typically arises in jury instructions, id. 1078 n.2 (J. Gould, dissenting), the analysis here does not differ.  Presley has not created a factual issue that race discrimination played a motivating factor in his terminations.

Accordingly, I grant summary judgment and dismiss the Title VII and ORS Ch. 659A disparate treatment race discrimination claims.

III.    <u>Retaliation</u>

Freightliner moves for summary judgment against the retaliation claims.  It argues that there is no causal link between Presley's protected activity and his termination.  In particular, Freightliner contends that its reinstatement of Presley on the last chance agreement is an intervening event that severs any causal connection to the earlier protected activities.

In a Title VII retaliation claim, a plaintiff can prove a prima facie case by establishing the following factors:  (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal link between the activity and the employment action.  Porter v. California Dept. of Corrections, 419 F.3d 885, 894 (9th Cir. 2005).

This first issue is to identify Presley's protected activity.  The parties agree that the following are all protected activities:  (1) the September 29, 2005 BOLI complaint; (2) the June 1 and July 20, 2005 grievances complaining of racial harassment; and (3) the December 13, 2005 complaint about being called a "pit monkey."

Freightliner contends that wearing a shirt with the message "More Black Team leaders More Black Supervisors at this company" is not protected activity.  Presley argues there is a factual issue of whether wearing the shirt is protected activity, in light of his previous complaints of race discrimination.  In reply, Freightliner claims that Presley is confusing the law on two issues:  (1) a complaint is still protected if the complained-of conduct does not violate Title VII as long as the employee reasonably believed that a Title VII violation occurred; and (2) the complaint must make clear to the employer that the employee believes a Title VII violation occurred.  Freightliner argues that the T-shirt message was too general to put Freightliner on adequate notice that Presley was alleging a violation of Title VII.

The court in E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008 (9th Cir. 1983), addressed whether sending a letter was a protected activity.  A group of black employees sent the letter to the Los Angeles School District complaining about an affirmative action award to a company official they described as the "Standard Bearer of the bigoted position of racism" at the company.  Although the court noted that the letter did not protest any specific instance of

Page 17 - OPINION AND ORDER

unlawful discrimination, that it primarily objected to the award rather than to company policies, and that it was sent to an outside party, the court concluded that the letter fell within the scope of Title VII's opposition clause.  Id. at 1012-13.

Although Presley would have been clearer if he had said that race discrimination could be alleviated by more black team leaders and supervisors, in light of his other complaints, many of which were formally raised, a jury could find that wearing the T-shirt was a protected activity.

Presley also claims that he was engaged in protected activity when he complained to Looney on November 30, 2005 that white employees were allowed to use the "ding cart" for personal reasons but Presley was disciplined for using it because he was black.  Although Freightliner did not address this event, I also conclude that a jury could find that it was a protected activity.

During oral argument, Presley also contended that he engaged in protected activity by calling La Rochelle and Mooers racists.  I disagree.  "Courts, however, have held that certain forms of 'opposition' conduct, including illegal acts or unreasonably hostile or aggressive conduct, may provide a legitimate, independent and nondiscriminatory basis for sanctions." Crown Zellerbach, 720 F.2d at 1012.  "There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed.  In such a case, his conduct, or form of opposition, is not covered" by Title VII's opposition clause.  Id. at 1015.  Presley admits not only calling La Rochelle and Mooers racists, he called La Rochelle a "fucking racist" numerous times in a voice loud enough to try to drown out La Rochelle.  This type of discourse does not lead to an enlightened discussion on issues in the workplace.  I find as a matter of law

that Presley's "fucking racist" accusations are unreasonably hostile and aggressive and are not protected conduct under Title VII.

Accordingly, Presley has established his prima facie case for his retaliation claims.

The causal link can be inferred from circumstantial evidence, such as the proximity in time between the protected activity and the retaliatory employment decision. Stegall, 350 F.3d at 1069 (only nine days lapsed between complaint and termination). See also Clark County School District v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, (2001) (citing with approval cases holding that a three month period and a four month period were insufficient to establish causation for a prima facie case when there is no causation evidence beyond the temporal proximity); Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000) (first retaliatory action occurred two and one half months after first in a series of complaints); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that a two-to-three-month delay was not too long to establish a causal link sufficient to withstand summary judgment and citing with approval Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F. Supp. 318, 324-25 (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976), which held that a six-month delay could satisfy the causation requirement); but see Villiarimo, 281 F.3d at 1065 (nearly 18-month lapse between protected activity and adverse employment action is too long, by itself, to give rise to an inference of causation and citing cases from other circuits with similar holdings for periods ranging from four to eight months); Manatt v. Bank of America, NA, 339 F.3d 792, 802 (9th Cir. 2003) (nine months too long to establish causation). If the plaintiff establishes the prima facie case, the burden shifts as in a disparate treatment case. Porter, 419 F.3d at 894.

I will address the two terminations separately.  First, there is the September 29, 2005 BOLI complaint and the June 1, 2005 grievance complaining of racial harassment followed by the termination on July 18, 2005.[1]

The September 29, 2005 BOLI complaint is nearly ten months before the July 18, 2005 termination.  Under the case law cited above, this is too long of a lapse in time to create a factual issue on the causal connection.  The June 1 grievance, however, is only six weeks before the July 18 termination.  This is close enough in time to establish a causal link, and accordingly the prima facie case, for retaliation.

The parties rely on the same arguments concerning pretext.  I note that some of the events on which Presley relies had not even occurred prior to the July 18, 2005 termination.  For the reasons explained above concerning the discrimination claims, I conclude there is no evidence sufficient to create a factual issue that Freightliner's reason for Presley's first termination was a pretext for retaliation for his complaints about race discrimination.

Second, there is the July 20, 2005 grievance complaining of racial harassment, November 30, 2005 ding cart complaint, December 13, 2005 "pit monkey" complaint, and the March 9, 2006 T-shirt statement followed by the final termination on March 10, 2006.  Presley can establish a causal connection, and his prima facie case, based on all of the protected activity except the July 20, 2005 grievance, which is too distant from the March 10, 2006 termination.  Again, however, my conclusions above concerning pretext are fatal to this count of the retaliation claim.

---

[1]  Although Presley was reinstated after his grievance, he was unpaid in the interim so this is an adverse employment action.

Page 20 - OPINION AND ORDER

Consequently, I grant summary judgment against the Title VII and ORS Ch. 659A retaliation claims.

Presley also alleges a claim under ORS 659A.230 for discrimination for initiating a civil proceeding, namely his BOLI complaint.  For the same reasons, Presley has not raised a factual issue that his protected activity was a substantial factor in his terminations.

## CONCLUSION

Defendant's Motion for Summary Judgment (#29) is granted.  This action is dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____25th_____ day of September, 2008.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge